No. 00-816

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 15

IN THE MATTER OF THE PETITION OF THE

DEADMAN'S BASIN WATER USERS

ASSOCIATION TO APPOINT A WATER

COMMISSIONER TO DISTRIBUTE STORED WATER.

APPEAL FROM: District Court of the Fourteenth Judicial District,

In and for the County of Musselshell,

The Honorable Roy Rodeghiero, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Patrick N. Dringman, Josephson & Dringman, Big Timber, Montana

For Respondent:

Catherine Truman, Musselshell County Attorney, Roundup, Montana

Submitted on Briefs: July 26, 2001
Decided: January 29, 2002

Filed:

_____

Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 On August 2, 2000, the Fourteenth Judicial District Court, Musselshell County, ordered that all irrigation of crops from the Musselshell River cease for a prescribed period of time, effective August 12, 2000, so long as Deadman's Basin Reservoir remained at its critically low water level. Appellant, Wiley Micks, filed a motion which requested that the District Court reconsider its August 2, 2000 order, issue a temporary restraining order, and issue a preliminary injunction. The District Court denied Micks' motion and Micks appeals. We reverse and remand.

¶2 We restate the sole issue on appeal as follows:

Did the District Court err when it denied Micks' motion to reconsider its August 2, 2000 order?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Micks operates a genetic materials facility know as Quad Five near Ryegate, Montana, which provides horse, cattle, and sheep blood for medical and scientific purposes. The operation requires that the animals be quarantined for most of the year in paddocks or barns. Thus, Micks must produce hay to sustain the animals during quarantine.

¶4 In order to irrigate his hay crop, Micks entered into a water purchase contract with the Deadman's Basin Water Users Association. In 2000, pursuant to the water purchase contract, Micks purchased the right to 775 acre feet of water from the Deadman's Basin Reservoir. On April 18, 2000, the District Court appointed two water commissioners for the 2000 irrigation season to distribute the reservoir water pursuant to a rotation plan.

¶5 On August 2, 2000, the District Court, on its own motion, found that the "remaining stored water level in Deadman's Basin Reservoir has reached a critical level" and that the reservoir water was needed to maintain the Musselshell River flow "to supply domestic,

municipal, stock and wildlife water usage." Therefore, the District Court prohibited the irrigation of crops from the Musselshell River between August 12 and September 30, 2000, so long as the reservoir maintained its critically low level. As of August 12, 2000, Micks believed that he had used only 431 of his contracted 775 acre feet of water. Based on his limited usage and other reasons, Micks presumed that the District Court's prohibition did not apply to him. Thus, Micks continued to use the reservoir water to irrigate his hay crop.

¶6 On August 12, 2000, the court-appointed water commissioners patrolled the Deadman's Basin irrigation system to verify that irrigators were complying with the District Court's order. The patrol revealed that the Quad Five and Sterling Zeier ranches were irrigating in violation of the District Court's order. Therefore, upon motion of the Musselshell/Golden Valley County Attorney, the District Court ordered Micks and Sterling Zeier to show cause on September 6, 2000, why they should not be held in contempt of court for failing to comply with the August 2, 2000 order.

¶7 On September 1, 2000, Micks filed a motion which requested that the District Court clarify its August 2, 2000 order to apply only to those individuals who obtain water directly from the Musselshell River. Micks argued that since his water was delivered via a system separate and apart from the Musselshell River, the District Court's order should not apply to him. Micks also argued to the District Court that the water in the reservoir should not be appropriated for other uses to Micks' detriment, as no senior water rights existed which enjoyed priority over Micks' water rights. Further, Micks' motion requested that the District Court issue a temporary restraining order to prohibit the water commissioners from interfering with Micks' use of the Deadman's Basin water. Finally, Micks' motion requested that the District Court order the water commissioners to show cause as to why the District Court should not issue a preliminary injunction forbidding them from utilizing Micks' Deadman's Basin water for purposes other than irrigation of Micks' property.

¶8 After receiving testimony at the September 6, 2000 show cause hearing, the District Court held Micks and Zeier in contempt of court for violating its August 2, 2000 order. The District Court ordered Micks and Zeier to pay a $500 fine and sentenced them to five days in the Musselshell County Jail. In the alternative, the District Court allowed Micks and Zeier to pay an additional $500 in lieu of the five-day jail sentence. The District Court denied Micks' motion for reconsideration, temporary restraining order, and preliminary injunction. Micks appeals the District Court's denial of his motion. However, he does not seek review of the contempt order. Zeier is not a party to this appeal.

## STANDARD OF REVIEW

¶9 The construction and interpretation of a contract is a question of law for the court to decide. *Ophus v. Fritz,* 2000 MT 251, ¶ 19, 301 Mont. 447, ¶ 19, 11 P.3d 1192, ¶ 19. The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. *Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

## DISCUSSION

¶10 Did the District Court err when it denied Micks' motion to reconsider its August 2, 2000 order?

¶11 In its August 2, 2000 order, the District Court determined that the water in Deadman's Basin Reservoir was needed to maintain the "minimal Musselshell River flows to supply domestic, municipal, stock and wildlife water usage." Therefore, the District Court prohibited the irrigation of crops from the Musselshell River for a specified period of time while the water level in the reservoir remained critically low.

¶12 Micks argues that no senior Deadman's Basin water right exists which entertains legal priority over his. As the Deadman's Basin water rights enjoy equal priority, Micks insists that any water rationing policy must be implemented on a pro-rata basis pursuant to the water purchase contracts. Micks contends that the August 2, 2000 order essentially instituted a first-come-first-serve water rationing plan which contravened the allocation provisions in the water purchase contracts. In so doing, Micks maintains that the District Court's order effectively misconstrued the contract provisions. Thus, Micks argues that the District Court's denial of his motion to reconsider constitutes reversible error.

¶13 Musselshell County contends that Micks suffered no injury from the August 2, 2000 order because Micks availed himself of his full allotment of water prior to August 12, 2000. The County agrees that Micks was entitled to 775 acre feet of water from the reservoir. However, the County contends that Micks leased 300 acre feet to Zeier and consumed the remaining 475 acre feet prior to August 12, 2000. It accordingly contends that this appeal is moot.

¶14 Contrary to the County's contention, the District Court found that Micks had not

appropriated his entire allotment of water. At the September 6, 2000 show cause hearing the District Court stated:

> This irrigation season lasted at least a month longer than was anticipated, and each of you [Micks and Zeier] had the same rights to take water, take your 100 percent or 130 percent out of there while there was water to be taken, and you did not do that.

Therefore, we decline to address the County's mootness argument further. We now proceed to the merits of Micks' position.

¶15 The jurisdiction to interpret and determine existing water rights rests exclusively with the water courts. *Mildenberger v. Galbraith* (1991), 249 Mont. 161, 166, 815 P.2d 130, 134. District courts are granted the authority to supervise the distribution of water that has already been adjudicated and to enforce such water decrees. *Baker Ditch Co. v. District Court* (1992), 251 Mont. 251, 255, 824 P.2d 260, 262-63. Under certain circumstances a district court may "fill in" a pre-1973 water decree with further delineations such as time or season of use and acreage of application. *State ex rel. Jones v. District Court* (1997), 283 Mont. 1, 7, 938 P.2d 1312, 1316. However, it is clear that a district court has no authority to issue a final adjudication of water rights. *Mildenberger*, 249 Mont. at 166, 815 P.2d at 134.

¶16 While the District Court's order clearly prohibits the irrigation of crops from the Deadman's Basin Reservoir, its justification for the prohibition is unclear. The following colloquy between the District Court and Micks' attorney demonstrates this ambiguity:

> Court: And then we come to this idea of you say that all irrigation rights on stored water are even or equal. Well, here's one of the differences. Now your irrigation water during irrigation season usually lasts for a period of four or five months and that's it and then your irrigation season is over with. All your irrigation of crops is for a period of four or five months and then you have no more use for it for irrigation usually. On the other hand, water for livestock and for city use, for drinking water, people and domestic water, that water is used all year round.
>
> . . . .
>
> Counsel: [I]s it your ruling that the stock water and municipal water rights, because of the longevity in their nature or other reasons, have some legal precedent or

seniority over my client's contract irrigation water rights?

Court: Well, I don't know if it has so much priority, but I mean the period of use is all year long for the cities' water as opposed to irrigation.

Counsel: And the reason I asked for the clarification is because pursuant to the Court's order we are going to - - you are going to service the municipalities' water rights and the in-stream stock water rights to the detriment of my client's irrigation rights, so I wanted it clear in my mind and for the record, is there some priority that you see?

Court: Well, that's one. One is for all year round, and the other is just for in the summer for irrigation and for a few months. Personally, yes, I see that people drinking water is probably more important than irrigating a person's crops. I'm not saying that's the law, because in Montana I don't think they've held that yet. Some states have.

¶17 As stated above, the District Court had the authority to supervise the distribution of previously adjudicated water or enforce an existing water decree. However, the record is devoid of any reference to a water decree proclaiming priorities among the users of the Deadman's Basin water. In fact, it was stipulated at the hearing that all of the users entitled to the reservoir's water shared equal priority pursuant to the water purchase contracts. It appears that the District Court simply made a priority determination regarding domestic and irrigation water consumption based on its own inclinations. In so doing, the District Court exceeded its authority to simply "fill in" a water decree with further delineations.

18 ¶Moreover, the District Court's August 2, 2000 order essentially implemented a water rationing policy for those irrigators utilizing the Deadman's Basin Reservoir water. Those irrigators who satisfied their demand by August 12, 2000, received their entire contracted allotment. Those irrigators who had utilized less than their full amount of water conditionally forfeited the remainder of their entitlement, effective August 12, 2000. This "use it or lose it" approach to the water shortage dilemma contradicted the water rationing plan in the Deadman's Basin water purchase contract, which provided for pro rata rationing in the event of a shortfall of water. Section one of the contract states:

[I]n the event that . . . [the reservoir] shall have an inadequate amount of water . . . to permit the furnishing of the number of acre feet of water in any year for which

there are such outstanding water purchase contracts, the water purchaser in such year shall be entitled, in lieu of each acre foot of water for which he has contracted, to a share of the total water available representing the proportion that one acre foot of water annually bears to 20,000 acre feet of water annually or . . . to the total number of acre feet of water agreed to be purchased annually under outstanding water purchase contracts.

¶19 The language of contractual provisions should be interpreted according to its plain, ordinary meaning. *Ophus*, ¶ 23. When the language of a contract is clear and unambiguous and, as a result, susceptible to only one interpretation, the duty of the court is to apply the language as written. *Ophus*, ¶ 23. This contract unambiguously requires a pro rata reduction in water distribution when an inadequate amount of water exists to satisfy the outstanding water purchase contracts. The August 2, 2000 order employed a "first-come-first-serve" policy in contravention of the water contract. Therefore, we hold that the District Court erred as a matter of law when it prohibited irrigation from Deadman's Basin Reservoir in a manner contrary to the water purchase contract. Consequently, the District Court erred in denying Micks' motion to reconsider the August 2, 2000 order. It further follows that Micks' motion to restrain the water commissioners from interfering with his use of the irrigation water to which he was entitled, that was stored in Deadman's Basin Reservoir, should have been granted.

¶20 Finally, Micks contends that the District Court's appropriation of his water for public purposes constituted a compensable taking. However, the District Court made no specific finding regarding the extent of Micks' water deprivation, nor did it determine whether the deprivation qualified as an unconstitutional taking. Therefore, this issue is not ripe for present determination, and we decline to address it.

¶21 Reversed and remanded for such further proceedings consistent with this Opinion as may be deemed necessary.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART

/S/ JIM RICE